**SO ORDERED.**

**SIGNED this 24 day of December, 2007.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

DESIGNATED FOR PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MICHAEL E. LOWE, | ) | Case No. 05-14936 |
| JACQUELINE E. FLOWERS-LOWE, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| IN RE: | ) | |
| | ) | |
| LARRY E. LeTOURNEAU, | ) | Case No. 05-15333 |
| DONNA M. LeTOURNEAU, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| IN RE: | ) | |
| | ) | |
| PATRICIA A. LITTLE, | ) | Case No. 05-15334 |
| | ) | Chapter 7 |
| Debtor. | ) | |

| IN RE: | ) | |
|---|---|---|
| | ) | |
| RICKY A. MURPHY, | ) | Case No. 05-15728 |
| DENISE L. MURPHY, | ) | Chapter 7 |
| | ) | |
|        Debtors. | ) | |
| IN RE: | ) | |
| | ) | |
| CYNTHIA MY NGUYEN, | ) | Case No. 05-16484 |
| | ) | Chapter 7 |
|        Debtor. | ) | |
| IN RE: | ) | |
| | ) | |
| FOREST EARL DENTON, | ) | Case No. 05-16951 |
| GERMAINE ANN DENTON, | ) | Chapter 7 |
| | ) | |
|        Debtors. | ) | |
| IN RE: | ) | |
| | ) | |
| MARC WILLIAM DITTMAR, | ) | Case No. 05-17094 |
| | ) | Chapter 7 |
|        Debtor. | ) | |
| IN RE: | ) | |
| | ) | |
| JOHN EARL HULSE, | ) | Case No. 05-17430 |
| | ) | Chapter 7 |
|        Debtor. | ) | |

## MEMORANDUM OPINION

This matter is before the Court on debtors' Michael Lowe and Jacqueline Flowers-Lowe ("Lowes") motion for summary judgment and chapter 7 trustee Linda Parks' motions for summary judgment on the chapter 7 trustees' motions for turnover of cash and stock distributions received by

debtors through their employment.[1]

Debtors are former employees of The Boeing Company who became employees of Spirit AeroSystems, Inc. ("Spirit") on June 17, 2005, the date Spirit acquired Boeing's commercial aircraft operations in Wichita, Kansas. At the time of the sale, debtors were represented by either the International Association of Machinists and Aerospace Workers ("IAM") or the International Brotherhood of Electrical Workers ("IBEW") (collectively referred to as the "Unions"). On June 17, 2005, the Unions ratified a collective bargaining agreement ("CBA") with Spirit. A provision contained in the CBA provided for certain employees to be eligible to receive cash and stock distributions under an anticipated Equity Participation Program ("EPP") upon the occurrence of specified events. Spirit issued those cash and stock distributions in December 2006 and March 2007, respectively, after an Initial Public Offering ("IPO") occurred.

The trustee filed a motion seeking to require the Lowes to turnover all distributions received from Spirit, contending that they were property of the estate pursuant to 11 U.S.C. § 541. The Lowes objected to the turnover and the Court held a preliminary hearing on January 30, 2007.[2] The Court entered an interim order denying the trustee's motion.[3] A pretrial order on the motion for turnover was entered in each case.[4]

---

[1] Case No. 05-14936-7, Dkt. 56; Case No. 05-15333-7, Dkt. 44; Case No. 05-15334-7, Dkt. 41; Case No. 05-15728-7, Dkt. 45; Case No. 05-16484-7, Dkt. 50; Case No. 05-16951-7, Dkt. 47; Case No. 05-17094-7, Dkt. 45; Case No. 05-17430-7, Dkt. 46.

[2] A motion for turnover was ultimately filed in all cases. The preliminary hearing, however, consisted of the Lowes and other Spirit employees who are not parties to the present matter before the court.

[3] Case No. 05-14936-7, Dkt. 35.

[4] Case No. 05-14936-7, Dkt. 72; Case No. 05-15333-7, Dkt. 51 (The pretrial order submitted in all cases, with exception of Case No. 05-14936-7, is the same document).

After being given the opportunity to engage in discovery relative to the turnover motions, the parties filed the referenced motions for summary judgment. Debtors oppose the chapter 7 trustee Linda Parks' motions for summary judgment.[5] The chapter 7 trustee Carl B. Davis opposes the Lowes' motion for summary judgment.[6] Trustee Linda Parks replied to the debtors' responses.[7] The Lowes did not file a reply.

**Summary Judgment Standards**

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[8] An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim."[9] When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial–whether, in other words, there are any

---

[5] Case No. 05-15333-7, Dkt. 53; Case No. 05-15334-7, Dkt. 53; Case No. 05-16484-7, Dkt. 66; Case No. 05-16951-7, Dkt. 56; Case No. 05-17094-7, Dkt. 57; Case No. 05-17430-7, Dkt. 59. Debtors Ricky and Denise Murphy, who appear pro se, have not filed a response to the trustee's motion. The arguments raised by the debtors in the responses and in the Lowes' motion for summary judgment are similar. For ease of reference in this opinion, any arguments or position jointly shared by the debtors shall be referred to as "debtors."

[6] Trustee Linda Parks' motions for summary judgment and trustee Carl Davis' response to the Lowes' motion for summary judgment are similar. For ease of reference in this opinion, any arguments or position jointly shared by the trustees shall be referred to as "trustees."

[7] Case No. 05-15333-7, Dkt. 56; Case No. 05-15334-7, Dkt. 61; Case No. 05-16951-7, Dkt. 61; Case No. 05-17094-7, Dkt. 64; Case No. 05-17430-7, Dkt. 65. The replies of the trustee raise essentially the same arguments.

[8] Fed. R. Civ. P. 56(c).

[9] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

-4-

genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[10] If so, summary judgment is inappropriate.[11]

**Findings of Fact**[12]

The following facts are either uncontroverted or, if controverted, construed in the light most favorable to the nonmoving parties:

1. In early 2005, Onex Partners LP and Onex Corporation ("Onex") began negotiations for the acquisition of Boeing Wichita.

2. During the spring of 2005, the Unions began collective bargaining negotiations.

3. Onex proposed a 10% wage cut for Union-represented employees.

4. Onex offered to establish an Employee Participation Plan ("EPP") which would enable the Union members to receive cash or stock if the new company completed an IPO, sale or merger (collectively referred to as a "Payment Event"), provided such event delivered at least a 15% annual profit to the initial equity investors.

5. Prior to the vote by the Union members on the CBA, a presentation explaining the EPP was created.[13] The presentation slides stated the following:

• Upon a Payment Event, each Option will be valued and the Program[14] will

---

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[11] *Prenalta Corp. v. Colo. Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir. 1991).

[12] Additional facts will be discussed, where appropriate, throughout the order.

[13] Some of the debtors attempt to controvert the fact that the presentation was given to the Union members. The Court finds that the debtors' knowledge of the EPP is irrelevant. Whether a debtor in fact realized that he or she might receive a payment under the EPP does not affect the Court's determination of whether the proceeds are property of the estate.

[14] As used here, "Program" and "EPP" mean the same thing and are used interchangeably by the Court.

-5-

- receive cash or stock. The company will decide whether the payment will be made in cash or stock.

- The cash or stock will then be allocated and distributed by the Program among eligible employees in compliance with applicable securities laws.

- The value of each Option will be the net proceeds received by Onex or the company in the Payment Event, less the "exercise price" of the Option.

- The exercise price of an Option will be $10.00 (equal to the price Onex is paying for each share), then growing by 15% per year until the Payment Event takes place.

- You never write a check for the exercise price - it will be deducted from the proceeds and you will receive cash or stock for the net amount.

6. Both Unions ratified a CBA on June 17, 2005 that contained an article on the EPP. The IBEW CBA contained the following language:

> Section 16.1 Equity Participation Program
>
> The parties agree to establish an equity participation program for IBEW-represented employees of Spirit AeroSystems, Inc, provided the employees are on the active payroll as of June 17, 2005. Stock appreciation rights will be contributed to the program for the select represented bargaining units, representing a profit opportunity on 10% of the initial common stock of Spirit Aerosystems parent company. The program will be able to distribute participating employees cash or common stock following a substantial sale by the Onex investors, a change of control merger, or an initial public offering of the common stock.

7. The IAM CBA contained the following language:

> ARTICLE 17 EQUITY PARTICIPATION PROGRAM
>
> The parties agree to establish an equity participation program for

-6-

IAM-represented employees of Spirit AeroSystems, Inc. Stock appreciation rights will be contributed to the program for the select represented bargaining units, representing a profit opportunity on 10% of the initial common stock of MidWestern's parent company. The program will be able to distribute participating employees cash or common stock following a substantial sale by the Onex investors, a change of control merger, or an initial public offering of the common stock.

8. Each of the debtors filed their bankruptcy case before October 17, 2005, after the CBAs were ratified, but before the EPP was created.[15]

9. From June to November 2006, Spirit filed six versions of a Form S-1 Registration Statement with the SEC, required by the government prior to conducting an IPO.

10. An Appendix to the June 30, 2006 S-1 Registration Statement stated the following:

> As part of the collective bargaining agreements, Holdings has agreed to establish a union equity participation program pursuant to which it will grant contingent stock appreciation rights ("SARs") tied to the value of its Class B common stock to trusts for the benefit of approximately 4,900 employees represented by the IAM, UAW, IBEW. 1,000 SARs will be granted to each eligible employee. The SARs will vest upon an initial public offering or other defined triggering events, upon which the trusts receive proceeds for each SAR equal to the difference between the net offering price per share (adjusted for stock splits) and $10, increased by 15% annually from the date of the Boeing acquisition. Proceeds will be paid in the form of cash or shares of common stock at the Company's option. The SARs expire after 15 years if no triggering event occurs. In accordance with FAS 123(R), no amount has been expensed for these SARs as the vesting conditions have not been met.

11. On October 27, 2006, Spirit created the EPP. The EPP stated that the following employees were eligible to participate in the EPP:

> The employees who are eligible to participate in the Plan are those

---

[15] October 17, 2005 is the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

hourly employees of Spirit who (a) are represented by one of the Unions or were represented by one of the Unions while employed by Spirit, (b) are former employees of The Boeing Company who either (I) became employed by Spirit on the day after the Closing Date, or (ii) were on an approved leave of absence on the Closing Date and became employed by Spirit immediately upon conclusion of such leave, and (c) were employed by Spirit for at least ninety (90) consecutive days during the period commencing on the day after the Closing Date, and ending on December 31, 2005. Notwithstanding anything herein, no individual Eligible Employee shall have any rights with respect to or interest in the Appreciation Rights, or any right to be allocated any portion of any Net Proceeds and no Eligible Employee is assumed that he or she will receive an allocation of any Net Proceeds.

12. On October 27, 2006, the "Effective Date" of the EPP, Spirit issued SARs for the benefit of the eligible employees.

13. On November 27, 2006, the closing date of the IPO, the employees' rights to the SARs vested. Eligible employees then received Union Equity Program Distribution Statement Letters and attended informational presentations.

14. The pre-tax value of the eligible employees' SARs was $61,440.00. They received that sum in a cash distribution of $34,556.00 around December 6, 2006, and 1,034 shares of Spirit Class A common stock around March 15, 2007.

**Analysis and Conclusions of Law**

The trustees assert that the debtors' interest in the SARs is property of the estate. The trustees argue the debtors had a contractual right to the SARs on the date that the CBA was ratified (June 17, 2005), which was prior to all debtors' bankruptcy filing date. The debtors respond that the SARs are not property of the estate because the EPP was not established until October 27, 2006, after the debtors' petition dates. In the alternative, the debtors argue that the SARs were income and exempt from the estate.

-8-

Pursuant to 11 U.S.C. § 541(a), an estate is formed when a debtor files for bankruptcy. The bankruptcy estate includes "all legal or equitable interests of the Debtor in property as of the commencement of the case," with some limited exceptions.[16] Even a debtor's contractual right to future, contingent property is considered property of the estate.[17] In order to be earmarked as property of the estate, the debtors must have had an interest in the property "as of the commencement of the case."[18] While each debtor has a different filing date, all debtors filed their petitions after June 17, 2005, the date of the CBA. Accordingly, the question before the Court is whether debtors had a legal or equitable interest in the SARs on the date their petition was filed.

The trustees cite to cases in which the court has held that employee bonuses, as contingent, future interests in property, are property of the estate. The Court finds these cases to be factually distinguishable from the one at bar.[19] In *Booth v. Vaughn* (*In re Booth*),[20] the court determined that the debtor's participation in the employer's profit-sharing plan was property of the estate even though the debtor did not receive his portion until after the filing of the bankruptcy petition. The

---

[16] 11 U.S.C. § 541(a).

[17] *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-06 (1983) (While there are limits on the reach of turnover, none requires that the debtor hold a possessory interest in the property at the time of filing); *Sharp v. Dery*, 253 B.R. 204, 206 (E. D. Mich. 2000) (Post-petition bonus that is conditioned on debtor's post-petition employment is not property of estate; the district court phrased the determinative issue as whether debtor had an enforceable right to receive the bonus when he filed his bankruptcy petition ); *Vogel v. Palmer (In re Palmer),* 57 B.R. 332 (Bankr. W.D. Va. 1986).

[18] § 541(a).

[19] The Court's independent research uncovered no reported decisions with facts like those in the present cases. All of the bonus and profit-sharing type cases reviewed by the Court were distinguishable by the existence of pre-petition agreements.

[20] 260 B.R. 281 (6th Cir. BAP 2001).

-9-

Case 05-15334    Doc# 63    Filed 12/24/07    Page 9 of 12

same result occurred in *In re Edmonds*.[21] Both *Booth* and *Edmonds* involve profit-sharing plans that *existed* and predated the respective debtors' petition dates. Similarly, in *In re Carlton*,[22] the debtor had a pre-petition stock option agreement to purchase company stock and the court concluded that the exercise of those options, made subsequent to the filing of the debtor's petition, were property of the estate. The difference between those agreements and the EPP is that the agreements were created prior to the debtors filing for bankruptcy.[23]

Here, the SARs were to be granted or contributed pursuant to the EPP.[24] But the EPP had not been established at the time the debtors filed their bankruptcy petitions. The language in both CBAs clearly states that the parties agree "to establish" the EPP. In its June 2006 S-1 filing with the SEC, approximately one year after the ratification of the CBAs, Spirit again stated that the parties agreed to create the EPP.[25] The EPP was not created until October 27, 2006, more than a year after the CBAs were ratified.

The CBAs are contracts between the employer and the unions. The employee is not a party to the contract, but rather a beneficiary thereof.[26] In order to enforce any provision of the CBA as a third-party beneficiary, a person must be the intended beneficiary and this must be "clearly

---

[21] 263 B.R. 828 (E. D. Mich. 2001).

[22] 309 B.R. 67 (Bankr. S. D. Fla. 2004).

[23] The cited cases do not set forth the exact terms of the agreements or the date that the agreements were entered into, but it is clear that the agreements were established pre-petition and in existence at the time of filing. Such is not the case here.

[24] *See* Fact No. 6, 7 and 10.

[25] Case No. 05-16951, Dkt. 49, exh. R.

[26] *See International Broth. of Elec. Workers, AFL-CIO v. Hechler*, 481 U.S. 851, 864-65 (1987).

-10-

expressed" in the contract.[27] The provisions in the CBAs do not specify the intended beneficiaries of the EPP. While the parties may have identified certain characteristics of what the EPP would contain during contract negotiations, those requirements were not set forth in the CBAs. The CBAs specifically stated that the "participating employees," a term that was not defined until the creation of the EPP in October 2006, would receive this benefit upon the occurrence of a triggering event.[28] The plain language of the contract controls[29] and it clearly did not define which employees would have rights under the EPP. Moreover, the provisions of the EPP state that "no individual Eligible Employee shall have any rights with respect to or interest in the Appreciation Rights . . . ."[30] There was no individually enforceable right to claim these benefits at the time these employees commenced their bankruptcy cases.

Accordingly, at the time of the debtors' filing for bankruptcy, their rights to the SARs were not established. Indeed, the SARs had not been granted or contributed to "eligible employees" when debtors' filed their bankruptcy petitions. The SARS were to be granted pursuant to the EPP, not the CBAs. Until the EPP was created, the SARs did not exist. Contrary to the arguments by the trustees, debtors did not have a contingent, future right to the SARs because (1) the EPP, pursuant to which the SARs would be granted, did not exist; and (2) there was no pre-petition document or agreement establishing that these debtors would qualify as participating or eligible employees having a contingent, future interest under the EPP. The debtors' contingent, future rights to the

---

[27] *State ex rel. Stovall v. Reliance Ins. Co.,* 278 Kan. 777, 793-794, 107 P.3d 1219 (2005).

[28] *See* Fact No. 6 and 7.

[29] *Bunnell Farms Co. v. Samuel Gary, Jr. & Assocs.,* 30 Kan. App.2d 739, 741-42, 47 P.3d 804 (2002).

[30] *See* Fact No. 11.

-11-

Case 05-15334    Doc# 63    Filed 12/24/07    Page 11 of 12

SARs were not established until the creation of the EPP in October 2006, which also identified them as participating employees under the EPP. These "contingencies" are far more remote than those presented in the *Booth* and *Edmonds* cases. The Court cannot conclude that these rights are "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start" and be regarded as property of the estate[31] Therefore, the Court concludes that the rights to the SARs are not property of the debtors' estates.[32]

**Conclusion**

The Lowes' motion for summary judgment is GRANTED.[33] The trustee's motions for summary judgment are DENIED.[34] The trustees' motions for turnover are also DENIED.[35]

# # #

---

[31] *Segal v. Rochelle*, 382 U.S. 375, 380 (1966).

[32] While the trustees have shifted their focus from the actual EPP distributions at the preliminary turnover hearing on January 30, 2007 to the SARs granted under the EPP in these summary judgment motions, this does not alter the Court's conclusion reached in its interim order entered February 2, 2007. The Court incorporates here its analysis contained in the interim order and believes it to be wholly consistent with the analysis set forth herein. *See* Case No. 05-14936-7, Dkt. 35 – "Interim Order."

[33] Case No. 05-14936-7, Dkt. 56.

[34] Case No. 05-15333-7, Dkt. 44; Case No. 05-15334-7, Dkt. 41; Case No. 05-15728-7, Dkt. 45; Case No. 05-16484-7, Dkt. 50; Case No. 05-16951-7, Dkt. 47; Case No. 05-17094-7, Dkt. 45; Case No. 05-17430-7, Dkt. 46.

[35] Case No. 05-14936-7, Dkt. 19; Case No. 05-15333-7, Dkt. 20; Case No. 05-15334-7, Dkt. 19; Case No. 05-15728-7, Dkt. 11; Case No. 05-16484-7, Dkt. 24; Case No. 05-16951-7, Dkt. 19; Case No. 05-17094-7, Dkt. 16; Case No. 05-17430-7, Dkt. 9.